IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **NINA JOY RAINEY TERRY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )    CV-09-BE-0761-S |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of the Social** | ) |
| **Security Administration,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

On September 28, 2005, the claimant, Nina Joy Rainey Terry, applied for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act, respectively. In both applications, the claimant alleged disability commencing on December 15, 2004 because of arthritis in her neck, congestive heart failure, emphysema, migraine headaches, and high cholesterol. The Commissioner initially denied the application, and the claimant requested and received a hearing before an Administrative Law Judge. On May 20, 2008, the ALJ held that the claimant was not disabled as defined by the Social Security Act, and therefore, was ineligible for disability insurance benefits and supplemental security income. The Appeals Council denied the claimant's request for review on February 23, 2009. Thus, the claimant has exhausted all her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision

1

of the Commissioner.

## I. ISSUES PRESENTED

The claimant presents the following issue for review: whether the ALJ properly discounted the opinion of an examining physician, Dr. Zaremba.

## III. STANDARD OF REVIEW

The standard of review is limited to determining whether the Commissioner applied the correct legal standards and whether substantial evidence supports the Commissioner's factual conclusions. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). In reviewing whether the ALJ applied the appropriate legal standards, "[n]o...presumption of validity attaches to the [Commissioner's] legal conclusions." *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987). However, this court does not review the Commissioner's factual determinations *de novo*, and therefore may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

Even if the court finds that the evidence "preponderates" against the Commissioner's decision, the court must affirm the ruling if it is supported by substantial evidence. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). Substantial evidence is defined as "more than a mere scintilla" and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In evaluating whether substantial evidence exists, the court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. Thus, a reviewing court not only must look to those parts of the record that support

the opinion of the ALJ, but also must take into account evidence that detracts from the ALJ's opinion. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Additionally, the ALJ must state with particularity the weight given different medical opinions and the reasoning behind each determination. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Failure to adequately do so is reversible error. *Id.* Generally, the ALJ must give substantial or considerable weight to the testimony of a treating physician. *Crawford*, 363 F.3d at 1159. However, the Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).

## V. FACTS

At the time of the ALJ's decision, the claimant was thirty-eight years old and thirty four at her alleged onset date (R. 43). She has a high school education and past relevant work experience as a school bus driver, paint store sales clerk, and store manager . (R. 63, 166). Claimant alleges that she has been unable to work since October 31, 2005 because of arthritis in her neck, congestive heart failure, emphysema, migraine headaches, and high cholesterol. She has not engaged in substantial gainful activity since the alleged onset date.

*Physical Limitations*

The record includes doctor's notes from the claimant's treating physician, Dr. Deborah Copeland, a family practice doctor, dating from April 5, 2004 until October 4, 2005 at Parkwest Family Medicine. (R. 129-35). On April 5, 2004, the claimant complained of a severe migraine headache that caused her to vomit, and numbness in her arms and legs. At that time, Dr. Copeland ordered an MRI and put the claimant on Xanaflx (a muscle relaxer) 4 mg. and Lortab 5 mg. (a pain medication). (R.135). On April 12, 2004, the claimant returned to discuss the results of her MRI. The MRI indicated cervical disc disease, including bulging discs, spinal stenosis and forminol stenosis. The claimant complained of right arm pain, and Dr. Chambers placed the claimant on Lortab. (R 134).

The claimant's next recorded medical visit was on May 28, 2004, when she saw Dr. Jeremy Barlow at St. Vincent's Hospital, complaining of headaches and right shoulder and arm pain. (R. 109). She told Dr. Barlow her pain was an 8 to 10/10. She also stated that she took OxyContin for pain and that she could not miss a dose or she would be in a tremendous amount of pain. He noted that a previous epidural block by Dr. Copeland did not seem to help and

traction only gave the claimant minimal relief. (R. 109). His reports detailed that the claimant's previous MRI showed desiccated disks at C2-3 through C6-7 and degenerative disk disease at C4-5 and C6-7. It also indicated lateral osteophytes with early neural foraminal stenosis at C3-4, C4-5, and C5-6. The MRI also indicated a small right paracentral disk herniation at C5-6 and disk bulge at C6-7. To help her deal with her pain, Dr. Barlow administered the first of a series of cervical epidural steroid injections. (R. 122). On June 11, 2004, Dr. Barlow again administered a cervical epidural steriod injection. At this time, he diagnosed the claimant with cervical disc displacement, cervical radiculitis, and cervicoalgia. (R. 119).

On June 15, 2004, the claimant returned to see Dr. Chambers, complaining of a headache and neck and shoulder pain. The records show she told Dr. Chambers she had "paralysis from the nose down." Dr. Chambers indicated that the disc disease was non-operable and also diagnosed the claimant with possible basilar migraine headaches accompanied by photophobia and nausea. She placed the claimant on Oxycontin and Imitrix and ordered physical therapy. She also referred the claimant to pain neurologist Dr. Charles Fagan. (R. 133). On June 29, 2004, the claimant returned for a check up on her headaches. The record indicates her headache and pain in neck was "much better" and that she did not have to take use Oxcontin daily anymore. (R. 132). It also notes that she was to have her third epidural block, which was completed on July 10, 2004, by Dr. Robert Nesbitt. (R. 113).

On July 28, 2004, the claimant saw neurologist Dr. Charles G. Fagan. (R. 103). He stated that she had undergone physical therapy and three epidural blocks without significant improvement and that Dr. Copeland placed her on Oxycontin. The Oxycontin did help with the claimant's pain, but she stopped because she was worried about addiction. The claimant

indicated that she had two types of headaches – a daily, progressive headache with a burning and also a vascular-like headache which would occur one or twice every few months accompanied by visual disturbances, nausea, vomiting, and photophobia. He noted this type of headache did respond to Imitrex. (R. 103). Dr. Fagan also noted that at the time of the exam, the claimant did not seem to be in any acute distress. He observed that she did have limited range of motion in her neck with a cervical parasinal muscle spasm. Dr. Fagan diagnosed the claimant with cervical radiculopathy (a "pinched" nerve) and stated "[a]t this point she has failed fairly aggressive medical management." (R. 103). He recommended Lidocaine patches and Neurontin dosing up to 300 mg. (R. 103).

Dr. Fagan also recommend an MRI scan to try to identify the cause of her progressive headaches. (R. 104). The record indicates the claimant had an MRI taken of her brain on August 5, 2004. The results showed no acute intracranial process or abnormal enhancement, although they did indicate minimal paranasal sinus disease. (R. 348).

On April 28, 2005, the claimant went to the emergency room complaining of a two-day history of chest pain and palpitations. (R. 146). Dr. David Denney, the emergency room physician, admitted the claimant to the hospital because the claimant continued to experience chest pressure and her pain did not respond to medication. (R. 146-47). Dr. Raymond Workman, a cardiologist, examined the claimant and recommended left heart catheterization. (R. 154). He noted that the claimant had an ongoing history of tobacco use starting from age 10 and that she smoked around a pack of cigarettes a day. (R. 153). Cardiologist Dr. Patrick Ifediba also evaluated the claimant (R.148-51). He reported the cardiac catheterization showed no significant coronary artery occlusions. The catheterization results also revealed global hypokinesis with an

overall ejection fraction 45%, characterized as representative of mildly depressed left ventricular systolic function. Over the course of the next few days, she continued to have long runs of premature ventricular contractions (PVCs) lasting up to 20 seconds at a time. She started on nebulizers for chronic bronchitis and IV antibiotics for pneumonia. (R. 148). Her chest x-ray was normal. In his discharge report on May 1, 2005, Dr. Ifediba indicated the claimant had experienced no heart palpations over the past 24 hours. The claimant was strongly advised to stop smoking and released from the hospital. (R. 148).

The record indicates that the claimant saw her primary care physician, Dr. Copeland, on May 5, 2005. Dr. Copeland noted her four-day hospital stay and wrote that the claimant suffered from COPD and acute bronchitis and was battling nicotine addiction. (R. 131). The claimant again returned to see Dr. Copeland on June 20, 2005, complaining that she was suffering from a migraine headache every day for the last two weeks, and that she was still wheezing daily. Dr. Copeland placed her on Xanaflex and Nortripline for headaches. The record also indicates that claimant wanted surgery on her cervical spine. (R. 130).

On September 8, 2005, the claimant had another MRI of her cervical spine ordered by radiologist Dr. Michael Mead. It indicated mild degenerative spinal stenosis at C4-5, C5-6, and C6-7 due to posterior osteophyte formation and multi-level neuro foraminal stenosis most pronounced at C4-5. (R. 351). He found nothing surgically amendable. (R. 352). He did a physical emanation that indicated she had negative impingement, tenderness over the bicipital groove, mild weakness in her C6-7 nerve roots on the left compared to the right and otherwise 5/5 motor strength. He also noted that she "would probably have to be referred to pain management." ( R. 352).

On October 4, 2005, shortly after filing her disability application, the claimant saw Dr. Copeland and complained of pressure in her chest and that she was having "shakes." She also reported being upset over her divorce. Dr. Copeland noted that the claimant seemed to suffer from anxiety, and she provided prescriptions for Xanax at 0.5 mg every six hours as needed but with a cap of thirty per month and Paxil CR at 25mg daily along with five refills for each medication. The record did not indicate the claimant had any complaint of headaches. (R. 129).

On December 6, 2005, Dr. Troy Kilpatrick, a family practitioner with MDSI Physician Services, did a consultative evaluation of the claimant. (R. 161-64). The claimant wore a neck brace during the visit and stated that she had been doing so for the past 16 months. She had a normal sinus rhythm and heart sounds. He stated that her coordination, station and gait "all appear to be fairly good." He did note that her cervical flexion was reduced to 20 degrees, her extension to 10 degrees, lateral flexion 10 degrees and rotation 60 degrees. (R. 163). Right shoulder range of motion is reduced to approximately 100 degrees compared to the normal range of 180.  Her motor strength involving the upper extremities on a scale of 5 would be 5 (R. 163). Dr. Kilpatrick found "no marked deformities, however, the reduction of rang of motion are present as stated above." (R. 163). He noted that the claimant was referred to a pain management clinic in September 2005. And that the claimant's records indicate diagnoses as congestive heart failure, emphysema, chronic obstructive pulmonary disease, arthritis, hypertension, postoperative hysterectomy and appendectomy. Dr. Kilpatick noted the claimant was taking Darvocet N 100 (pain medicatino), Toprol (for chest pain and high blood pressure), Dapkote (anti-seizure medication), Paxil (anti-depressant), Aspirin, and Albuterol (bronchodilator to treat breathing problems) . (R. 161). He also noted her history of cervical disc disease. (R. 164).

On December 7, 2005, clinical psychologist Dr. John Neville saw the claimant for a consultative psychological evaluation related to her disability claim (R. 165). Dr. Neville diagnosed the claimant as suffering from depressive disorder not otherwise specified (NOS), marked by irritability, poor memory, low activity level, fair sleep, and variable appetite. The claimant reported that she was suicidal and showed Dr. Neville wrist scabs that she said were residuals of a suicide attempt from two days earlier, but denied any history of mental health treatment. The claimant also complained that she suffered from panic attacks, but Dr. Neville observed that from her descriptions, those episodes would not meet the diagnostic criteria for panic attacks. Dr. Neville further noted that the claimant was not anxious, restless, or tearful and also stated that she appeared angry rather than deeply depressed. He also stated that she demonstrated good concentration and memory, but poor insight and judgment. The claimant reported that she maintained her personal hygiene and grooming and performed household chores, but did no shopping or driving and had no recreational social activities. Dr. Neville stated that her ability to carry out instructions was no more than mildly impaired by her mood disorder and her ability to cope with ordinary work pressures no more than mildly to moderately impaired.(R. 179). However, he recommended psychotherapy and psychiatric treatment. Even with treatment, he stated that her psychological prognosis was only fair over the next six to twelve months. (R. 167).

Two weeks later, on December 21, 2005, the claimant again saw Dr. Copeland. She complained of pain in her shoulder and arm, stating that she "[couldn't] lift things." (R 354). Dr. Copeland ordered diagnostic imaging of the claimant's shoulder. However, the result was normal with no bone, joint or soft tissue abnormalities. (R. 355). The record also indicates that the

9

claimant was taking Paxil and Xanax for anxiety and that the claimant was to see the "ortho" if medication gave her no relief. (R. 354).

About ten months later, on October 29, 2006, the claimant went to the emergency room at UAB Medical West, complaining of chest pain and tightness. (R. 280-294). Her chest x-ray was normal showing clear lungs, no vascular congestion or pleural fluid collections. (R. 294).

On March 2, 2007, the claimant went to the emergency room at UAB Medical West for an ankle injury due to a fall. (R. 305). Dr. Keith Chesser reported that an X-ray revealed a lateral malleolar oblique fracture in the claimant's ankle. (R. 311).

On February 6, 2007 and February 21, 2007, Dr. Daniel Kyle of Bessemer Health Center saw the claimant. On February 6, the claimant complained of an eight-day headache. (R. 328). The claimant stated that she had lost her insurance in 2004 and had not seen a primary care physician since then. She also complained of back pain and agoraphobia (anxiety disorder associated with public, open spaces). The claimant reported taking Darvocet, Depakote, Nortriptyline (anti-depressant), Xanax (anti-anxiety medication) and that she was supposed to take Albuterol and Budesonide (asthma medication), but was unable to afford either medication. (R. 328). Her neck was tender on the right and left sides. (R. 329). Dr. Kyle also observed that her cervical spine rotation had diminished resistence due to pain. Dr. Kyle listed under "assessment" that the claimant suffered from hypertension, chronic obstructive pulmonary disease, possible cervical stenosis/stricture, hyperlipidemia (elevated levels of lipids in the bloodstream associated with cardiovascular disease), obesity, headache syndromes, continuous Nicotine dependence, depression, and that the claimant was "in remission" for alcohol abuse. (R. 330). On  February 21, 2007, Dr. Kyle conducted a follow up visit. (R. 327).  He noted that the

claimant had no relief from chronic headaches, but that her earache was resolved. Dr. Kyle also indicated that her depression was improving and that the claimant no longer wanted to stay in bed all day. He also observed that the claimant continued to smoke three packs of cigarettes a day. (R. 327).

Almost a year later, on January 18, 2008, the claimant went to Cooper Green Mercy Hospital clinic and reported that she was having three to four "bad" headaches a week in addition to neck and back pain. (R. 336). The attending neurologist, Dr. Robert Slaughter, prescribed Neurontin (seizure and nerve pain medication) to be taken three times a day for a month and then four times a day for an additional two weeks before a return visit scheduled for six weeks out. He noted that her "motor" was 5/5 though she was complaining of "subjective radiating pain." The claimant reported 3-4 bad headaches a week. Dr. Slaughter noted no tremors. (R. 336).

On February 11, 2008, consultative physician Dr. Jack L. Zaremba, an internist, examined the claimant upon a referral by her attorney. The claimant told Dr. Zaremba that she was in constant pain that was aggravated by neck movement. She also reported arm and shoulder pain as well as weakness and difficulty with repetitive manipulation of her arms, bending, and lifting. She reported general shortness of breath and difficulty breathing with activity. (R. 337). She reported that jarring or riding in a vehicle aggravated her back to the point where she may be bedridden for the next twenty-four hours. Dr. Zaremba conducted a physical examination of the claimant in which he found that her neck was rigid and unable to bend, rotate or extend because of severe pain. He also noted some paravertebral spasm. He also reported that her lungs revealed bilateral rhonchi and end-expiratory wheezing. He also stated she could not abduct her shoulders above 100 degrees because of pain. He also noted that she had an unsteady gait and difficulty

with the flexion/extension of the left lower ankle because of an incisional repair. Her motor strength was 4/5. Dr. Zaremba concluded that the claimant suffered from severe cervical degenerative disc disease, migraine headaches, COPD, depression, lumbar mechanical disease, hypertension, and mitral valve prolapse. (R. 339).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits, the claimant requested and received a hearing before an ALJ. (R. 371). At the hearing, the ALJ called orthopedic surgeon Dr. Arthur Brovender. Claimant's attorney made no objection to his testimony. Dr. Brovender thought it was remarkable that her motor examination was normal even though she had complaints of lower back pain (R. 376). He noted she possessed normal reflexes, sensation, and strength. After reviewing all claimant's medical records, Dr. Brovender stated that he found no evidence of a condition that would constitute at 12-month-long, severe, medically determinable impairment. The ALJ then asked the attorney if he had any questions and the attorney replied that he did not. (R. 378). The ALJ then questioned Dr. Bovender as to the claimant's residual functional capacity. Dr. Bovender stated that he would have her lift 20 pounds occasionally, 10 pounds frequently. She could sit and stand for up to six hours with breaks. He found no limitations of lifting overhead, no limitations according to fine finger manipulation. He would not have her crawl, but she could stoop or bend. He would not have her go up ladders or scaffolds. The claimant's attorney told the judge he did not believe the expert, but refused the ALJ's offer to call the expert back so the attorney could question him. (R. 379).

Next, the claimant testified as to her condition. She stated that she had worked at the following jobs: Cracker Barrel as a server after her onset date from January to March 2005; at

J&S Industrial Supply for one week; and at Green Springs Shell for a week and half in 2006. She indicated that prior to her marriage, her children "took care" of her. (R. 382). She stated that she had not driven a car in two years and that her husband had brought her to the hearing. (R. 383).

Claimant testified that on a day-to-day basis between December 2004 and June 2005, she would wake up in the mornings and her whole body would be numb. She could not roll over and would have to "holler" for her children to push her out of bed at which time she would begin to regain sensation in her extremities. She had sharp pains running through the left side of her body from the neck down. She had migraines that would make her throw up. She stated that at that very moment of the hearing, her heart was "skipping" and "jumping around." She testified that in that specific time period, she would not have been able to perform a light, sit-down job due to "burning" in her arms and legs and numbness. (R. 385). She took Aluberol three times a day on the breathing machine and then a steroid twice a day on the breathing machine, but she had to quit taking them when she lost her insurance. (R. 386).

The ALJ next questioned the vocational expert, William Crunk. (R. 386). He stated she had past relevant work as a bus driver, deli worker, paint sales person, and cashier. The ALJ then asked the VE to consider the RFC offered by Dr. Bovender. The VE said the claimant could perform the work of a cashier. The claimant's attorney questioned the VE as to Dr. Zaremba's evaluation of the claimant that stated she could lift and carry five pounds or less, sit for two to three hours in an eight hour day, and walk one hour. The VE testified that if this were found credible, she would not be able to perform past relevant work. (R. 394).

*The ALJ's Decision*

On December 7, 2007, the ALJ determined that the claimant was not disabled under the

Social Security Act. (R. 24). The ALJ found that the claimant (1) met the insured status requirements of the Social Security Act through June 30, 2005, (2) had not engaged in substantial gainful activity since December 15, 2004, the alleged onset date, and (3) suffered from severe impairments of low back pain and cervical degenerative disc disease. (R. 17).  The ALJ also found, however, that the claimant did not suffer from severe impairments of congestive heart failure, chronic obstructive pulmonary disorder (COPD), emphysema, migraine headaches, residual left ankle facture, or depression.  The ALJ found, finally, that claimant's severe impairments of low back pain and cervical degenerative disc disease did not prevent her from doing her prior work as a cashier. (R. 22)

       The ALJ first noted that claimant was diagnosed with congestive heart failure and COPD in April 2005. (R. 18)  He observed, however, that subsequent hospital records indicated that while she displayed some diminished lung capacity, her episodes of premature ventricular contractions (PVCs)  ceased after the initial hospital admission.  The ALJ also observed that the medical record showed that the claimant's diagnosis of chronic bronchitis during the same time was successfully treated.  Finally, he observed that several other medical examinations revealed no breathing problems.  In her December 2005 visit to Dr. Kilpatrick, she reported no respiratory symptoms and the findings of a pulmonary examination were unremarkable.

       The ALJ also found that the evidence of migraines was insufficient to establish a severe impairment. (R. 20)  He noted that after her initial June 2004 examination for a severe headache accompanied by paralysis "from the nose down," claimant's CT scan was negative, she retained full strength, had a normal gait, displayed normal neurological findings, and her symptoms were relieved with IV medications.  Additionally, the ALJ records two subsequent consultations with

doctors about migraine headaches in 2005 in which she described having two distinct types of headaches and was prescribed medication for them. Most recently, in 2008, claimant reported that she was having three to four "bad" headaches a week and was prescribed medicine for them. However, when she saw another doctor a month later, she reported that she was taking only half of the prescribed amount of medicine and did not complain of any headache. The ALJ concluded that the claimant's headaches occur infrequently and have responded to medication. (R. 20).

Next, the ALJ found that the claimant's history of left ankle fracture was not a severe impairment lasting for a full twelve months because three weeks after receiving treatment her gait and coordination were normal on examination.

The ALJ also found that the claimant did not suffer from severe psychological impairments. On October 4, 2005, she reported experiencing panic attacks, having "shakes," and being "stressed" and "upset," and her doctor prescribed her Xanax and Paxil to help manage the anxiety. (R. 21). Claimant then visited a consultative psychological examiner, Dr. John Neville, and reported suicidal ideation and panic attacks. Dr. Neville found that the claimant was not anxious, restless, or tearful, that she maintained her personal hygiene and performed household chores, but that she did no shopping, driving or recreational activities. He diagnosed claimant with depressive disorder, not otherwise specified.

The ALJ discounted this diagnosis, however, because the claimant did not repeat to Dr. Copeland two weeks later any of the complaints she made to Dr. Neville. (R. 21). Further, he found no evidence that claimant had ever complained of depression before or that a treating examiner had seen signs of depression or suicidal ideation. Also, the ALJ observed that when the claimant returned to the doctor later that month, she reported that her depression and anxiety

had improved. As a consequence of these finding, the ALJ concluded that the claimant demonstrated "no limitation in terms of her activities of daily living and no more than mild limitation in social functioning and concentration, persistence, or pace" and that, therefore, she failed to meet the criteria for "severe" mental impairments. (R. 22).

The ALJ found that the claimant had a residual functional capacity to perform light work, except that she requires a sit/stand option; is unable to crawl or climb ladders, ropes, or scaffolds; and should avoid workplace hazards. (R. 22). In making this conclusion, the ALJ reviewed claimant's history of back problems, including a 2004 MRI. The ALJ noted that while this MRI revealed some degenerative disk disease, neural foraminal stenosis, a disc herniation and a bulging disk, the claimant

> demonstrated full, supple cervical range of motion and normal upper extremity findings during physical examinations conducted in April and August 2005; restricted cervical and right shoulder range of motion at the December 2005 claims-related consultative examination; normal cervical and upper extremity findings again in October 2006; neck tenderness and diminished rotation resistance due to pain in February 2007; normal cervical and upper extremity findings in March 2007 and January 2008. (R. 22)

The ALJ also found that the claimant lacked full credibility. First, he noted that her testimony reported that for a period of time her seven and eight year old children took care of her. Second, though she wore a neck brace to the hearing and reported having worn it for 16 months, there was "no evidence in her records showing that the collar had been prescribed for a continuous, uninterrupted period exceeding one-year" and "no indication that the claimant was wearing the collar when seen by treating physicians during this same period." (R. 23). The ALJ then observed that the testimony of Dr. Brovender, who found the claimant had a residual functional capacity that would enable her to perform light work, was credible, based on reliable

medical evidence, and consistent with other medical evidence in the record.  He found that the findings of Dr. Zaremba that the claimant would have to spend four to five hours a day in bed were not consistent with the medical record and should be accorded no weight.

On the basis of the above considerations and the testimony of a vocational expert, the ALJ found that the claimant had the residual functional capacity to perform the claimant's past work as a cashier.

## VI. DISCUSSION

Claimant contends that the ALJ erred in adopting the findings of his telephonic, non-examining medical expert over the opinion of the examining consultants.

The ALJ must state with particularity the weight given different medical opinions and the reasoning behind each determination. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Failure to do so adequately is reversible error. *Id.*  Generally, the ALJ must give substantial or considerable weight to the testimony of a  treating physician. *Crawford*  363 F.3d at 1159. However, the Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).

Precedent in this circuit provides no basis for reversing the decision of the ALJ in this case.  The claimant contends that "it is well-established in the Eleventh Circuit that the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician." However, the case claimant cites in support, *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985), does not actually supply this proposition.  Rather, that case stands for the proposition that "[a]n administrative law judge must accord 'substantial' or 'considerable' weight to the opinion of a claimant's treating physician unless 'good cause' is

shown to the contrary." *Id*. (Emphasis added.)  Of course, an examining physician can be either treating or consultative.  The policy rationale behind the rule requiring substantial weight to the opinion of a treating physician is that the physician will have had extensive and cumulative experience from which to drawn in making an assessment of the patient.  While it may be true to some extent that an examining physician has a better basis from which to make a determination than a non-examining physician, the reasoning behind the court's decision in *Broughton* applies to a lesser degree to an opinion based on a one-time consulting examination. Further, the claimant cites no case law in this circuit requiring an ALJ to give greater weight to the opinion of a one-time consultative examining physician than to the a non-examining consultative physician, or to the long-term treating physician.

In addition, the claimant cites *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987), for the proposition that, in contrast to that of a treating physician, the opinion of a one-time examiner is not entitled to deference.  But, of course, the proposition that such an opinion is entitled to no deference does not mean that the ALJ cannot consider it in making his determination.  Moreover, Dr. Zaremba, on whose disabling opinion the plaintiff relies heavily, and which the ALJ discounted, was a one-time, consultative physician.  As such, application of the rule from *McSwain* leads to the conclusion that neither the opinions of Dr. Brovender nor that of Dr. Zaremba command deference.  The ALJ, then, acted within his discretion to discount the opinion of the one-time, consultative examiner, Dr. Zaremba, and credit more heavily the opinion of the non-examining physician, Dr. Brovender.  The ALJ also stated sufficient reasons for preference of opinions.

Claimant also contends that the ALJ's reliance on the telephonic medical expert, Dr.

18

Brovender, without prior warning to the claimant or her attorney, was prejudicial.  She argues that the telephonic hearings are "difficult to decipher and leave the [claimant] at a distinct disadvantage when it comes to cross-examination." (Pl.'s Br. 13).  However, claimant cites no case law from this circuit in support of her argument that use of a such an expert is unduly prejudicial or prohibited.  Moreover, this court notes that neither the claimant nor her attorney objected to the use of the telephonic medical expert when asked, and the claimant declined the opportunity to cross-examine him.

Finally, this court notes that the ALJ's opinion recited in great detail the claimant's medical record and, in doing so, provided substantial evidence that he weighed and considered the record as a whole.  Therefore, even had the ALJ not relied at all on the opinion of the telephonic, consultative physician, his examination of the evidence from other physicians supplied sufficient basis on which to make a finding of no disability.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.

The court will enter a separate order in accordance with this Memorandum Opinion.

DONE and ORDERED this 23rd day of September 2010.

_Karon O. Bowdre_
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE